# United States Court of Appeals
## For the First Circuit

No. 14-2132

UNITED STATES OF AMERICA,

Appellee,

v.

RENATO DE LA CRUZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Selya and Thompson,
Circuit Judges.

Eduardo Masferrer, with whom Masferrer & Associates, PC was on brief, for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

August 19, 2016

**SELYA**, **Circuit Judge**.  In this criminal appeal, the appellant strives to convince us that we ought to overturn his convictions for theft of public money, use of a falsely obtained social security number, and aggravated identity theft.  We are not persuaded: neither the appellant's quest for suppression of evidence nor his challenge to the district court's jury instructions has merit, and the record reveals that the government's case rests on a durable foundation.  Accordingly, we affirm the judgment below.

## I.  BACKGROUND

We start with a sketch of the facts and the travel of the case.  To the extent that we rehearse the facts, whether here or in greater detail in connection with our discussion of particular issues, we take them in the light most favorable to the jury's verdict, consistent with record support.  See United States v. Maldonado-García, 446 F.3d 227, 229 (1st Cir. 2006).

The appellant's true name is Renato De La Cruz.  The appellant is a citizen of the Dominican Republic who entered the United States illegally sometime in 1993.  Not long after, he went to New York City, where he paid a man $1,500 for identity documents in the name of "Alberto Pena."  These documents matched the identity of a real Alberto Pena (also a native of the Dominican Republic, who became a lawful permanent resident of the United States).

Once the appellant had procured Pena's identity documents, he was able to obtain a Dominican passport from the Dominican embassy and a "green card" from the Immigration and Naturalization Service. In December of 1994 — four days before the real Pena applied for a social security number — the appellant used Pena's name, date of birth, parentage, and alien number to apply for and receive a social security number. Shortly thereafter, the appellant — apparently nervous about his physical proximity to the real Pena (who was residing in New York) — moved away, eventually relocating to Massachusetts.

While in Massachusetts, the appellant worked intermittently for a general contractor. At various times from December of 2010 through October of 2012, the appellant received unemployment benefits, including 21 weeks of federally-funded extension benefits. Because an alien is eligible for such unemployment benefits only if he is authorized to work in the United States, the appellant had to use his social security number to secure his benefits. The federally-funded benefits that the appellant received amounted to $11,340, and the appellant does not dispute that these benefits comprised public funds within the purview of 18 U.S.C. § 641.

On December 18, 2012, U.S. Immigration and Customs Enforcement (ICE) officers arrested the appellant. A federal grand jury subsequently returned a three-count indictment charging him

- 3 -

with theft of public money, in violation of 18 U.S.C. § 641 (count 1); use of a falsely obtained social security number to obtain benefits, in violation of 42 U.S.C. § 408(a)(7)(A) (count 2); and aggravated identity theft, in violation of 18 U.S.C. § 1028A (count 3). A superseding indictment tracked this three-count structure.

In due course, the appellant moved to suppress statements made on the date of his arrest. Through a supplemental motion, he also sought suppression of any physical evidence gathered at that time. The government opposed these motions. After an evidentiary hearing, the district court denied the motions. See United States v. De La Cruz, No. 13-10022, 2014 WL 1515410 (D. Mass. Apr. 18, 2014). The appellant moved for reconsideration, but to no avail. See United States v. De La Cruz, No. 13-10022, 2014 WL 1796654 (D. Mass. May 5, 2014).

On June 25, 2014 — following a three-day trial — a jury found the appellant guilty on all three counts. The appellant filed a post-trial motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c) as to counts 1 and 3, which the district court rejected. See United States v. De La Cruz (De La Cruz III), No. 13-10022, 2014 WL 3925497 (D. Mass. Aug. 12, 2014). The court sentenced the appellant to concurrent one-month terms of immurement on the first two counts and a consecutive 24-month term of immurement on count 3. This timely appeal followed.

## II.  ANALYSIS

We divide our discussion of the issues into three segments, corresponding to the components of the appellant's asseverational array.

## A.  Suppression.

To place the suppression issues into perspective, we think it useful to embellish the barebones account provided above. In the process, we accept the facts as supportably found by the district court. See United States v. Romain, 393 F.3d 63, 66 (1st Cir. 2004).

On December 18, 2012, a supervisory ICE officer, Andrew Graham, accompanied by fellow ICE officers, sought to arrest the appellant as a person unlawfully present in the United States. Because the appellant was the subject of an ongoing Department of Labor (DOL) criminal investigation, a DOL agent and a representative of the Social Security Administration also went along.

The cadre of officers and agents proceeded to an apartment building in Salem, Massachusetts, believing that the appellant resided there with a girlfriend (Mayra Espinal). Graham and another ICE officer went to the front door of Espinal's apartment. When the appellant came to the door, Graham — speaking across the threshold — employed a ruse and told him (falsely) that the officers were concerned that he might have a gun. The

appellant consented to a frisk and told officers that they could enter the apartment. Once inside, Graham arrested the appellant.

After retrieving additional clothing for the appellant, the officers escorted the appellant into a hallway outside the apartment. They were joined by Christina Rosen, the DOL agent. Graham asked the appellant whether he preferred his Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 479 (1966), to be read to him in English or in Spanish. The appellant elected to hear them in English. Graham then read the appellant his Miranda rights from a preprinted card. Standing in the hallway, the appellant made a number of admissions: he related his true name, acknowledged that he had no lawful right to be in the United States, and disclosed his purchase of Pena's identity information.

Roughly 20 minutes after being given his Miranda warnings, the appellant was transported to the ICE office in Burlington, Massachusetts. Upon his arrival, he was processed administratively, and an ICE officer explained that he was under arrest for immigration violations and that he would have to appear before an immigration judge to determine his status. To that end, he was given a notice to appear in the immigration court, which explained, inter alia, his right to be represented by an attorney at no expense to the government. The officer made it clear, however, that he was only serving the appellant with paperwork

- 6 -

anent the immigration matter and that other officers would process him with respect to criminal charges.

After his administrative processing concluded, the appellant was taken to a different interview room.[1] Agent Rosen introduced herself and explained that a criminal investigation was being conducted into the appellant's suspected theft of identity and misuse of public funds. She further explained that the agents in attendance were criminal investigators, not immigration officers. The appellant received his Miranda rights once again, and he signed a form acknowledging that he understood those rights and was willing to waive them.

The appellant proceeded to make a number of admissions. He recounted how he had obtained the Pena identity documents; admitted that he used these documents to get a passport, green card, and social security number; and described how, as Pena, he had collected unemployment benefits in Massachusetts. Those admissions were memorialized in a statement transcribed by Agent Rosen and signed by the appellant.

Against this factual backdrop, the appellant musters three arguments in support of his assertion that the district court erred in denying suppression. First, he submits that the ICE

---

[1] The immigration officer who processed the appellant administratively was not present in this room, nor did he participate in the interview that ensued.

- 7 -

officers acted outside their authority when they arrested him without an administrative arrest warrant and, thus, his subsequent statements should be suppressed as the fruit of an illegal arrest. Second, he submits that the officers' warrantless entry into the apartment offended the Fourth Amendment because he did not validly consent to their entry. Finally, he submits that his Miranda waiver at the ICE office should be disregarded because he was provided with intervening and conflicting administrative warnings. We address these arguments sequentially, pausing first, however, to frame the standard of review.

In reviewing the denial of a suppression motion, we assay the district court's conclusions of law de novo and its factual findings, including its credibility determinations, for clear error. See United States v. Feliz, 794 F.3d 123, 130 (1st Cir. 2015). The fact-based aspect of this review is "highly deferential." United States v. Floyd, 740 F.3d 22, 33 (1st Cir. 2014). "If any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial." United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008).

The appellant's first argument, which centers on the lack of an administrative arrest warrant, emanates from 8 U.S.C. § 1357(a)(2). That statute authorizes an immigration officer to effect a warrantless arrest only in two situations: when an alien "in [the officer's] presence or view is entering or attempting to

enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens"; or when the officer "has reason to believe that the alien . . . is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."[2]  The appellant asserts that the ICE officers who arrested him violated these strictures, and that the remedy for that violation is suppression of all the statements that he subsequently made.

We assume, albeit without deciding, that the ICE officers who effected the arrest exceeded their federal statutory mandate.  Even so, the appellant's argument is foreclosed by a solid phalanx of case law.

"Suppression of evidence is strong medicine, not to be dispensed casually."  United States v. Adams, 740 F.3d 40, 43 (1st Cir.), cert. denied, 134 S. Ct. 2739 (2014).  Normally, a violation of federal or state law triggers the exclusionary rule only if the evidence sought to be excluded "ar[ises] directly out of statutory violations that implicate[] important Fourth and Fifth Amendment

_____

[2] Along the same lines, 8 C.F.R. § 287.8(c)(2)(ii) provides that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."  For present purposes, the regulation adds nothing to the statutory proviso and, thus, we make no further reference to it.

interests."  Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006); see United States v. Caceres, 440 U.S. 741, 751-55 (1979).[3]  As a result, "[t]he cases in which the Supreme Court has approved a suppression remedy for statutory violations are hen's-teeth rare." Adams, 740 F.3d at 43.

We have said before, and today reaffirm, that a statutory violation "untethered to the abridgment of constitutional rights" is insufficient to justify suppression.  Id.  The case at hand falls squarely within the contours of that premise: the failure to obtain an administrative arrest warrant as contemplated by 8 U.S.C. § 1357, without more, does not justify the suppression of evidence. See United States v. Abdi, 463 F.3d 547, 556-57 (6th Cir. 2006).[4]

This brings us to the appellant's second argument: that suppression was warranted because he never validly consented to the ICE officers' entry into the apartment.  That argument is dead

---

[3] We say "normally" because a statutory violation would also animate the exclusionary rule when the statute itself mandates suppression as a remedy.  See, e.g., United States v. Giordano, 416 U.S. 505, 524-29 (1974).  Because the statute at issue here — 8 U.S.C. § 1357 — does not provide for an independent suppression remedy, this exception to the usual rule is inaccessible to the appellant.

[4] Because the appellant does not argue that his arrest independently violated his constitutional rights apart from the statutory violation, we need not address whether his arrest was reasonable under the Fourth Amendment.  See Ortiz v. Gaston Cty. Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002).  In all events, as we discuss infra, the officers had probable cause to effect the arrest.

on arrival: the appellant has failed to specify what evidence he seeks to suppress as a result of the ICE officers' allegedly invalid entry into the apartment. Nor does this seem to be an oversight: at trial, the government introduced no physical evidence derived from within the apartment. The appellant must be arguing, then, for suppression of the statements that he made in the outside hallway of the apartment building and at the ICE office. But he is whistling past the graveyard: regardless of the validity vel non of the appellant's consent to the ICE officers' entry into the apartment, that entry has no bearing on the admissibility of statements that the appellant later made outside the apartment. We explain briefly.

In New York v. Harris, the Supreme Court declined to apply the exclusionary rule to statements made by a defendant at a police station after the police had effected an unconstitutional arrest in the defendant's home (which the police had entered without either a warrant or the defendant's consent). See 495 U.S. 14, 16, 21 (1990). The Court's reasoning started with a frank recognition of the rule prescribed in Payton v. New York, 445 U.S. 573 (1980): "that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 495 U.S. at 16. After acknowledging that the defendant's arrest transgressed both the Payton rule and the Fourth Amendment, however, the Harris Court

- 11 -

held that suppression of the defendant's statements was not compelled. The Court explained that "the rule in Payton was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." Id. at 17. Fairly viewed, the defendant's statements at the police station were neither "the product of being in unlawful custody" nor "the fruit of having been arrested in the home rather than someplace else." Id. at 19.

So it is here. The ICE officers indisputably had probable cause to arrest the appellant both administratively (for being an alien unlawfully present in the United States) and criminally (for aggravated identity theft and related offenses). Indeed, the appellant, who has fought tooth and nail on a variety of other points, has not contested the existence of probable cause. It follows inexorably — as night follows day — that the appellant was lawfully in the officers' custody when he made the inculpatory statements outside the confines of his home.

Moreover, those statements bore no relation to the underlying illegality that he alleges (that is, the ostensibly nonconsensual entry into his home). After all, the appellant was neither questioned about anything observed in the apartment nor

confronted with any evidence found there.[5]  In a nutshell, then,

the appellant's inculpatory statements were not the product of

unlawful custody, nor were they the fruit of the appellant having

been arrested in his home (rather than somewhere else).  Neither

the absence of an administrative arrest warrant nor the lack of

valid consent could change that equation.[6]

We turn next to the appellant's third suppression

argument, which seeks exclusion of the statements that he made at

the ICE office in Burlington.  He contends that his Miranda waiver

at Burlington was neither knowing nor intelligent since he was

given an earlier administrative warning that differed in an

important respect from the standard Miranda warning.  The district

court rejected this contention, and so do we.

Specifically, the appellant points to the portion of the

administrative warning in which he was advised that he might have

to pay for legal representation should he desire the services of

---

[5] The appellant's subsequent statements at the ICE office were even further removed — temporally, spatially, and in every other arguably relevant sense — from the warrantless arrest.

[6] Laboring to blunt the force of this reasoning, the appellant relies on the Supreme Court's decision in Brown v. Illinois, 422 U.S. 590, 602-03 (1975).  This reliance is mislaid.  In Brown, the arrest was effected without either a warrant or probable cause. See id. at 591.  By contrast, probable cause unarguably supported the warrantless arrest here.  Brown, therefore, offers no succor to the appellant.

an attorney.[7]  This advice conflicted with his broader right to appointed counsel under Miranda and, in his view, "[r]equiring someone to sort out such [conflicting warnings] is an unfair burden to impose on an individual already placed in a position that is inherently stressful."  United States v. San Juan-Cruz, 314 F.3d 384, 388 (9th Cir. 2002).

San Juan-Cruz is not in point.[8]  There, the defendant, following his arrest by Border Patrol agents, was advised of his rights in connection with the administrative arrest.  See id. at 386.  Pertinently, an agent told the defendant that he had the right to have counsel present during questioning, but not at the government's expense; and that any statements he made could be used against him for purposes of removal.  See id.  Shortly thereafter and in the same location, the same agent read the defendant his Miranda rights.  See id.  The defendant then proceeded to make a series of incriminating statements.  See id.

---

[7] The notice to appear provided to the appellant advised him that "[i]f you so choose, you may be represented in this [immigration] proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review . . . . A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice."  A notice of rights provided contemporaneously contained similar language.

[8] The present case does not require us to determine whether San Juan-Cruz was correctly decided, and we leave that issue for another day.

at 387.  The Ninth Circuit held that, under these circumstances, the Miranda warnings were insufficiently clear.  See id. at 389. The court explained that:

> When a warning, not consistent with Miranda, is given prior to, after, or simultaneously with a Miranda warning, the risk of confusion is substantial, such that the onus is on the Government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment.  The Government should not presume after having read two sets of contradictory warnings to an individual that he or she possesses sufficient legal or constitutional expertise to understand what are his or her rights under the Constitution.

Id.

This case is a horse of a different hue.  Here, law enforcement personnel read the appellant his Miranda rights in his preferred language even before he received any administrative warnings.  Later, the appellant was given both administrative warnings and Miranda warnings, but under circumstances that differed materially from those in San Juan-Cruz.  First — unlike in San Juan-Cruz — the appellant already had received Miranda warnings (while at the apartment building) and made what amounted to a full confession before any administrative warnings were given. Second — unlike in San Juan-Cruz — different officials administered the different warnings.  Third — unlike in San Juan-Cruz — the agent who administered the subsequent set of Miranda warnings took care to explain to the appellant that she was a criminal investigator and that she and her colleagues were distinct from

the ICE officers handling the administrative case.  Fourth — unlike in San Juan-Cruz — there were both spatial and temporal gaps between the administrative warnings and the Miranda warnings (that is, they were administered in different rooms at different times).

On this record, the government handily carried its burden of distinguishing the appellant's administrative rights from his criminal rights and clarified to him the nature and extent of his Fifth Amendment rights before he confessed to the DOL criminal investigator.  Simply put, the risk of confusion that troubled the San Juan-Cruz court did not exist here.  We hold, therefore, that the district court did not clearly err in finding that the appellant was not confused or otherwise unfairly prejudiced by the presentation of the conflicting warnings.

To say more about the matter of suppression would be pointless.  Based on what we already have said, it is pellucid that the district court did not err in turning aside the appellant's attempts to suppress evidence.

### B. **Sufficiency of the Evidence.**

The appellant contends that the government failed to prove beyond a reasonable doubt that he was guilty either of theft of public funds (count 1) or aggravated identity theft (count 3).  After glancing at the legal landscape, we address these contentions separately.

Where, as here, a defendant files a timely post-verdict motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), his rights are fully preserved. See United States v. Castro-Lara, 970 F.2d 976, 980 (1st Cir. 1992). Thus, we review the denial of his motion for judgment of acquittal de novo. See United States v. Kuc, 737 F.3d 129, 134 (1st Cir. 2013). In the course of that review, we take the evidence, both direct and circumstantial, in the light most hospitable to the government and draw all reasonable inferences in the government's favor. See id. In this endeavor, "we must ask whether 'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" Id. (quoting United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012)). We do not "weigh the evidence or make credibility judgments; these tasks are solely within the jury's province." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000).

It is against this backdrop that we evaluate the appellant's sufficiency challenges to counts 1 and 3 (taking those counts in reverse order).

**1.    Aggravated Identity Theft (Count 3).** Under the statute of conviction, 18 U.S.C. § 1028A(a)(1), a person is guilty of aggravated identity theft if, "during and in relation to any felony violation enumerated in subsection (c)," that person "knowingly transfers, possesses, or uses, without lawful

authority, a means of identification of another person."  Here, the government charged theft of public money (unemployment benefits), in violation of 18 U.S.C. § 641, as the underlying felony.  The parties agree that such an offense is one of the crimes enumerated in section 1028A(c).

The superseding indictment charged the appellant with using two "means of identification" in committing theft of public funds: Pena's name and date of birth.  The appellant asseverates that the evidence was insufficient to show that these "means of identification" appropriated the specific identity of the real Pena.  We disagree.

"Means of identification" is a term of art.  Congress has defined that term to mean, in relevant part,

> any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—
>
> > (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number.

18 U.S.C. § 1028(d)(7).  Given this definition, the record here is ample to ground a finding that the appellant committed aggravated identity theft.

The evidence introduced at trial established that unemployment benefits are public funds and that an individual

- 18 -

seeking such benefits must provide biographical information —
including his name and date of birth — in his application.  So,
too, the evidence established that the appellant used both Pena's
name and date of birth in applying for (and receiving) unemployment
benefits.  Based on this evidence, a rational jury could have found
beyond a reasonable doubt — as this jury did — that the appellant
committed aggravated identity theft.

Our decision in Kuc is instructive.  There, the defendant
used the full name of the victim and the name of the victim's
company to ship stolen computer parts to multiple addresses.  See
Kuc, 737 F.3d at 134-35.  We held that these two "means of
identification" were sufficient "to identify a specific
individual" — the victim — within the meaning of 18 U.S.C.
§ 1028(d)(7).  See id. at 135.  On that basis, we upheld the
defendant's conviction for aggravated identity theft.  See id.

In an effort to put the genie back into the bottle, the
appellant, ably represented, spins an argument that is too clever
by half: though acknowledging that he used Pena's purloined name
and date of birth in applying for unemployment benefits, he
suggests that those items, singly or in the ensemble, did not
constitute a "means of identification" within the meaning of 18
U.S.C. § 1028A(a)(1).  To support this suggestion, he baldly
asserts that "the evidence produced at trial established that the
name and date of birth were part of a fictional identity that

included an address, an employer and a social security number that, taken together, did not identify the true Alberto Pena of New York for purposes of obtaining unemployment benefits."

This approach gets the appellant high marks for creativity, but a failing grade on the merits. To begin, the appellant's own admissions undermine his present assertion. In the statement that he dictated and signed at the ICE office in Burlington (which was introduced at trial), the appellant confessed that he knew he was wrongly appropriating Pena's identity. In his own words, "I was scared that Alberto Pena would find out I was using his identity" and "I know using someone else's identity is wrong and illegal. I used Alberto Pena's identity to stay in the country & to work & help my family."

We add, moreover, that the case law gives no sustenance to the appellant's construct. In United States v. Savarese, we rejected the premise that "[a] name . . ., without more, cannot constitute a 'means of identification' for purposes of aggravated identity theft." 686 F.3d 1, 7 (1st Cir. 2012). To the contrary, "[t]he language of § 1028 . . . plainly contradicts this theory, defining a 'means of identification' as 'any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name, social security number, date of birth, [or] official State or government

issued driver's license or identification number . . . .'"  Id. (quoting 18 U.S.C. § 1028(d)(7)(A)).

The appellant tries to wriggle out from under Savarese. He makes much of the fact that he was using a social security number different from the number assigned to the real Pena.  This distinction, however, does not make a dispositive difference: the appellant cannot avoid responsibility under section 1028A(a)(1) simply by attaching a different social security number to the true Pena's name and date of birth.[9]  In the last analysis, the statutory term "means of identification" does not require that the information used to identify the specific individual whose identity has been stolen must match that individual in every detail.  Any other construction of the statute would be fatuous: it would enable a defendant to avoid responsibility under section 1028A(a)(1) by the simple expedient of using a single piece of information that does not coincide with the victim.

---

[9] The genesis of the appellant's social security number furnishes further evidence that the appellant misappropriated Pena's identity.  The jury had available to it the appellant's application for a social security number, in which the appellant used Pena's name, date of birth, place of birth, and parentage. In addition, the appellant used his own green card (obtained under false pretenses), which contained Pena's alien number.  As the district court perspicaciously noted: "any lingering doubt as to the association of the name with the true Alberto Pena's identity would have been dispelled by tracing the social security number used by [the appellant] to the original application for the number."  De La Cruz III, 2014 WL 3925497, at *1.

The appellant makes no headway by hawking the Fourth Circuit's decision in United States v. Mitchell, 518 F.3d 230 (4th Cir. 2008), for the proposition that "non-unique identifiers" are "insufficient to identify a single, unique individual."  In that case, the evidence, taken in the light most favorable to the government, showed only that the defendant had taken the name "Marcus Jackson" from a telephone book.  See Mitchell, 518 F.3d at 233.  Noting that the defendant had used "a hopeless muddle of non-matching and matching information," the court held that the defendant's mere use of the name "Marcus Jackson" was insufficient to identify a specific individual.  Id. at 236.  It was careful to explain, however, that when "a non-unique identifier is coupled with other information to identify a specific individual, 'a means of identification of another person' is created."  Id. at 234.  That is exactly what happened here: the appellant used Pena's name and date of birth in applying for unemployment benefits, and those two pieces of information (taken in conjunction with one another) were sufficient to identify a specific individual — the real Pena.  See 18 U.S.C. § 1028(d)(7).

    2.  **Theft of Public Funds (Count 1).**  The appellant argues that the government's proof was insufficient to establish that he stole money with the intent of depriving the United States of the use of that money and, therefore, that the district court erred in denying his motion for judgment of acquittal as to count

1.   In support, he asserts that he "incorrectly, but genuinely, believed that because he worked and paid into the unemployment system under the Social Security number he was issued, he was therefore entitled to receive unemployment benefits until he could resume working to support himself and his family."

This argument lacks force.  The appellant never testified, and the record is utterly devoid of any evidence as to the appellant's innocent state of mind.  The evidence before the jury pointed in the opposite direction: the DOL agent who interviewed the appellant in Burlington testified that the appellant admitted that he knew "100 percent" that his receipt of unemployment benefits was a crime and that he "didn't earn" those benefits.  These admissions were enough to enable the jury to conclude that the appellant acted with the necessary criminal intent.[10]

The appellant makes little progress by pointing out that he paid income tax on the unemployment benefits that he received.  Paying taxes on ill-gotten gains is as consistent with a desire that a crime go undetected as it is with a lack of criminal intent.

---

[10] The appellant suggests that he made these admissions in reference to his unlawful presence in the United States.  That suggestion is fanciful: the statements were made in the course of an interview by an agent who had made pellucid that she was a DOL criminal investigator, not an immigration officer; and the context gave the jury ample reason to think that the statements referred to the appellant's collection of unemployment benefits.

## C.  **Jury Instructions.**

The last leg of our journey takes us to the appellant's claim that the district court's jury instructions were faulty. The standard of review for claims of instructional error is not monolithic: such claims, if preserved, are reviewed either de novo or for abuse of discretion, depending on the nature of a particular claim.  When the claim of error involves a question as to the legal sufficiency of a trial court's charge to the jury, such as a claim that the court omitted a legally required instruction or gave an instruction that materially misstated the law, our review is de novo.  See, e.g., United States v. Nascimento, 491 F.3d 25, 33 (1st Cir. 2007); Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 133 (1st Cir. 2004).  When the claim of error focuses on the trial court's word choices, however, our review is for abuse of discretion.  See, e.g., United States v. Hall, 434 F.3d 42, 56 (1st Cir. 2006); Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 78-79 (1st Cir. 2001).

We summed up these varying standards of review in Elliott v. S.D. Warren Co., 134 F.3d 1 (1st Cir. 1998), in which we stated that "[a] trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion."  Id. at 6.  Sometimes, a reviewing court may have to employ these varying standards of review sequentially to resolve

a single claim of instructional error (for example, reviewing de novo to determine that a challenged instruction is legally correct and then reviewing for abuse of discretion to weigh the court's choices about how best to communicate that legal principle). See, e.g., United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995).

With these standards in mind, we turn to the appellant's claim of instructional error. That claim, which was preserved below, zeros in on the district court's charge with respect to the second element of aggravated identity theft. The court told the jury that it had to find that "in committing the offense, the defendant used a means of identification of another." It added that the jury had to "find that the means of identification played a role in committing the offense of theft of money."

The appellant posits that the phrase "played a role" impermissibly diluted the government's burden of proving this element of aggravated identity theft. In his view, the district court "was required . . . to state that the 'means of identification' used must cause or be essential to the commission of the offense."

This view is meritless. 18 U.S.C. § 1028A(a)(1) imposes criminal liability on a person who "during and in relation to [an enumerated crime], knowingly . . . uses, without lawful authority, a means of identification of another person." The statute nowhere says that the means of identification must cause or be essential

to the enumerated crime — nor is there any valid reason for us to read such a requirement into the statute.

In all events, a district court is entitled to some latitude in deciding how best to communicate legal principles to jurors. See United States v. Paniagua-Ramos, 251 F.3d 242, 245 (1st Cir. 2001). The court below did not exceed that latitude. Its "plays a role" language closely mirrors the statutory language ("during and in relation to"), at least in practical effect, and the court neither erred nor abused its discretion in employing this phraseology.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment is

**Affirmed.**